David A. McDonnall *et al.*

*v.*

The People of the State of Illinois.

*Opinion filed November 1, 1897.*

1. Pleading—*when indictment sufficiently charges defendants with inflicting a mortal wound.* A count in an indictment for murder which charges that defendants, in assaulting the deceased, "did strike, penetrate and wound him a mortal wound," from which he then and there died, sufficiently charges defendants with inflicting the mortal wound.

2. EVIDENCE—*indictment for murder—what not admissible to support theory of self-defense.* Questions asked a witness in a murder trial as to whether he had ever seen the deceased with pistols or knew anything about his carrying a pistol are properly refused, where there is no claim by the defendants of knowledge of his custom in carrying weapons, and the deceased had never made threats against them nor had any previous difficulty with them.

3. SAME—*evidence held sufficient to sustain joint conviction for manslaughter.* Evidence that the defendants went armed to a place where they were likely to meet the deceased for the common purpose of investigating a difficulty he had had with a relative of both, and that one held and controlled the team they were driving while the other fired the fatal shot, is held to be sufficient to sustain a joint conviction for manslaughter.

4. APPEALS AND ERRORS—*effect of failure of court to give instruction of his own motion.* Parties jointly indicted for murder cannot complain of the failure of the trial court to give an instruction of its own motion that the jury might find one guilty and the other not guilty, where no instruction to that effect is asked by either.

WRIT OF ERROR to the Circuit Court of Clark county; the Hon. FERDINAND BOOKWALTER, Judge, presiding.

GRAHAM & TIBBS, GEORGE N. PARKER, and CALLAHAN, JONES & LOWE, for plaintiff in error.

E. C. AKIN, Attorney General, (D. C. HAGLE, and C. A. HILL, of counsel,) for the People.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Plaintiffs in error were indicted for the murder of Charles Bell, and were convicted of manslaughter and sentenced to the penitentiary under the Indeterminate Sentence act of 1895. The argument of their counsel is mainly directed to the question of the constitutionality of that act, but that question has been decided in favor of the validity of the act.

There were five counts in the indictment, and a motion to quash was sustained as to the fourth and fifth but was overruled as to the others. The first and third are confessedly good, but it is argued that the court erred in not

quashing the second, because it fails to allege that the defendants, or either of them, gave to Charles Bell the mortal blow of which he died. The killing was by shooting, and the averments were all in the usual and technical form of charging a murder by that means, unless it be the clause complained of, which, instead of alleging that defendants gave deceased the mortal wound, alleged, in substance, that they did strike, penetrate and wound him one mortal wound, which wound was particularly described, and of which said mortal wound it was charged that the said Charles Bell then and there instantly died. The clause is inartificially drawn, but it charges defendants with inflicting the mortal wound. To wound a person a mortal wound is fairly equivalent to giving such wound. The nature of the charge could be readily understood by the jury, and a judgment on that count could be pleaded in bar to a further prosecution for the same offense. There was no error in sustaining the count.

The defense made at the trial was, that Charles Bell was killed by defendants at a meeting with him on the public highway, in necessary self-defense. The court sustained objections to questions concerning Bell, asked of a witness by defendants' counsel, which it is claimed were proper under the issue, and which were as follows: "I will ask you if you know anything about—whether you ever did or did not see him with pistols?" "Do you know anything about him carrying a pistol?" It will be observed that there was no attempt to prove by these questions that Bell was in the habit of carrying a pistol, and no time was fixed when he had or carried one. The fact that he at some time had a pistol would be immaterial. He was wholly unarmed when killed, and did not have any pistol or other weapon, or even so much as a pocket knife. There had never been any threat by him against defendants, or either of them, or any difficulty between him and them. Even if he had been in the habit of going armed, and it had been attempted to prove that fact,

there was no claim that defendants had learned of his custom, so that it could not have influenced them in shooting him. They could not have believed themselves to be in imminent and immediate danger of great bodily harm or loss of life on account of a habit of Bell of which they had no knowledge. The evidence was properly excluded.

The first instruction given 'for the People is complained of as stating that the danger which gives rise to the right of self-defense must be real, and not merely apparent. The criticism is unfounded. The instruction says: "It must appear, from the evidence, that the danger was so urgent and pressing that in order to save their own lives or prevent their receiving great bodily harm the killing of the other was apparently necessary." The necessity for taking Bell's life need not have been real, but, as held in many cases, if such necessity was so apparent as to induce a belief of its existence in the mind of a reasonable man that would be sufficient. If the appearances would justify such a belief then the killing would be apparently necessary, and the instruction only required such an apparent necessity.

The court gave, at the instance of the defendants, the following instructions:

"The court instructs the jury that the law is, if a person is assaulted in such a way as to produce in the mind of a reasonable person a belief, and if he does honestly believe, he is in actual danger of losing his life or of suffering great bodily harm, he will be justified in defending himself, although the danger be not real but only apparent. Such a person will not be held responsible, criminally, if he acts in self-defense from real and honest convictions as to the character of the danger, induced by reasonable evidence, although he may have been mistaken as to the extent of the actual danger.

"The court further instructs the jury, that if you believe, from the evidence in this case, that the defend-

ants, or either of them, was assaulted by the deceased in such a way as to induce in such defendant a reasonable and well-founded belief that he was actually in danger of losing his life or of suffering great bodily harm, then he was justified in defending himself, whether the danger was real or only apparent. Actual or positive danger is not indispensable to justify self-defense. The law considers that men, when threatened with danger, are obliged to judge from appearances, and determine therefrom as to the actual state of things surrounding them; and in such case, if persons act from honest convictions, induced by reasonable evidence, they will not be held responsible, criminally, for a mistake as to the extent of the actual danger."

Two other instructions, given at the request of the defendants, also stated the law of self-defense further, in accordance with the same principle. These instructions stated the rule as to the danger being only apparent as fully and as favorably for the defendants as they could ask, and taking the instructions together it is not possible the jury could have been misled on that question.

The eighth and tenth instructions given at the instance of the People are criticised, on the ground that they authorized a verdict of guilty merely on proof that the defendants shot and killed Bell. They stated that the jury should find the defendants guilty, if they believed, from the evidence, beyond a reasonable doubt, that the defendants committed the crime in question as charged in the indictment, even though Bell had sustained a bad reputation and character for quiet and peaceableness and defendants had sustained a good reputation and character in that respect. The point made in these instructions was, that the fact of Bell being of bad reputation for peace and the defendants being of good reputation in that regard would not justify them in killing him in manner and form as charged in the indictment, which stated all the elements necessary to constitute a crime. The

court instructed the jury on the question of defendants' good character, giving them the benefit of the presumption arising therefrom, and we are not able to see how the instruction could have been misunderstood.

A reversal is also asked on the ground that the court failed in its duty to defendants in not giving an instruction not asked by either of them, to the effect that the jury might find one of them guilty and the other not guilty. It is said that it never occurred to the jury that they could do that, but they thought they must send an innocent defendant along with a guilty one. We do not think that can be so, and especially in view of the tenth instruction given at their request, as follows:

"The court further instructs the jury, that before the prosecution have any right to find either of these defendants guilty of this charge, it must appear, from the evidence in this case, that such defendant willfully, maliciously and feloniously did kill said Charles Bell, and that the same was not done in self-defense, as defined in these instructions. One person will not be liable for the act or acts of another, unless it is shown, from the evidence in this case, beyond a reasonable doubt, that such defendant aided, advised or abetted the commission of such act or acts."

Defendants did not ask the court to give an instruction in the form now insisted upon, and they say it would be unreasonable to expect them to do so, as the jury would regard it as a concession on their part that one might be guilty. The instructions, when given, are the instructions of the court, and there can be no difference with the jury whether one given was asked for or not, or by whom. They would not, and should not, know one from the other. It could not be unreasonable to expect defendants to ask for all instructions which they thought ought to be given. The court might, if he saw fit, instruct the jury on his own motion; but defendants had a right to ask such instructions as they saw fit, and can

not complain of a failure of the court to give an instruction not asked for.

Seven instructions requested by defendants were refused, and counsel say they should have been given to the jury, but make no argument in support of them. They may therefore be properly dismissed without extended explanation, by saying that they were all properly refused. So far as they contained any correct propositions of law they were contained in others given.

No error occurred during the trial, but it is said the court should have granted a new trial because the verdict was not supported by the evidence, which was substantially as follows: The deceased, Charles Bell, had a quarrel with and assaulted Daniel Clements, the uncle of defendant John W. Clements and father-in-law of the defendant David A. McDonnall. The defendant Clements heard of the assault in York soon after, and according to one witness said, "That aint settled." According to his testimony some one asked him if he thought the affair was settled, and he said, "If my uncle could call back twenty years it aint, but since he has been trying to live a Christian-life he don't fight." He then went across the street and bought some cartridges, which he testified were intended to kill rats, and went home and hitched his team to his farm wagon, which had a spring seat. He testified that he left his cartridges in his house. He took his wife and drove to McDonnall's, telling her that he would go over and see how badly his uncle was hurt. At McDonnall's his wife got out of the wagon, and McDonnall came from the barn through the house, getting his revolver on the way, and got into the wagon. The loaded revolver was laid on the spring seat between them, and they started toward West York on their errand. Bell also lived at West York, and was accustomed to drive along the road from that place daily at about that time, and they met him on the road. There were two tracks some distance apart, with weeds between, and defend-

ants were driving in the north track. The evidence is conflicting as. to which track Bell was in. They say he was in the south track and turned out of it toward them, between the two tracks, while there was evidence that his buggy track turned out of the north track between the two. However that may be, the parties passed each other ten feet or more apart, the defendants in the north track, and Bell, with a single horse and open buggy, between the two tracks. They both stopped just after passing. No one else heard what was said, and, Bell being dead, the only evidence on that subject was from defendants. They testified that Bell spoke first, and said "Good evening," and they said "Good evening;" that Bell spoke about the difficulty and the cause of it, which he alleged to have been false statements by the uncle of what he had done; that McDonnall said, "Didn't you?" whereupon Bell jumped out of his buggy saying that he did not, and with a threat to fix McDonnall if he accused him; that Bell put his right hand behind him and shook his fist at McDonnall, who immediately shot and instantly killed him, the ball going through his heart. Bell was totally unarmed and defenseless. When he got out of the buggy he did so on the opposite side away from the defendants and did not go in their direction, but went farther from them behind his horse. When he reached the horse's head and his body was exposed he was shot down and fell in front of his horse. There is no contradiction or attempt to contradict the conclusive evidence, from the situation, that Bell, in leaving his buggy, went further away from defendants. He never took a step toward them, but every step carried him further away, with the horse and buggy between him and them. It is incredible that this unarmed and defenseless man was assaulting or attempting to assault the defendants, or that there was anything which would arouse a belief in the minds of reasonable men, situated as they were, that it was necessary to kill him. It rather appears that he was shielding

himself than making an assault on them. Both defend-
ants stood up and McDonnall got over the spring seat
toward Bell, and having killed him they drove on and
left him lying there in the road. We do not think it
strange that defendants failed to impress the jury with
their assumed defense.

It is urged that Clements had nothing to do with the
killing and that the verdict against him was not justified.
Defendants testified that McDonnall was in the habit of
carrying the revolver on the wagon seat and killing game
with it. He testified that his wife had not been very well
and asked him to kill a young rabbit, and that he took it
for that purpose on this occasion. It is therefore argued,
that as the revolver was taken for an innocent purpose
and the shooting was done by McDonnall, the defendant
Clements should have been found not guilty. Whether
the revolver was taken merely for the purpose alleged
and whether the cartridges belonged to Clements or not,
the defendants went armed where they were likely to
meet Bell and in the common enterprise of investigating
the difficulty. They had passed Bell, and Clements, who
was driving, could have driven on away from him. He
stood up and held the team, and controlled them while
McDonnall got over the spring seat with the revolver
and did the killing. He got up from the spring seat, and
a witness testified that he looked up when he heard the
report of the pistol and saw the two defendants standing
in the wagon, about the middle of the wagon-bed, from
which it would appear that Clements also got over the
seat toward Bell with McDonnall. The evidence would
justify the belief that he was equally concerned in the
transaction, except that McDonnall held the revolver
and fired the shot.

The judgment will be affirmed.

*Judgment affirmed.*