People of State of Illinois, Plaintiff-Defendant in Error, v. Floyd Cavanaugh, Jr., Defendant-Plaintiff in Error.

Gen. No. 11,026.

Second District.

September 27, 1957.

Released for publication in abstract form October 15, 1957 and so published in 14 Ill.App.2d 573.

Ordered published in full August 22, 1958.

Fred P. Wagner, of Mendota, and Taylor E. Wil-helm, of Ottawa (Fred P. Wagner, of counsel) for plaintiff in error.

Harland D. Warren, State's Attorney (Peter F. Ferracuti, Assistant State's Attorney, of counsel) for defendant in error.

PRESIDING JUSTICE DOVE delivered the opinion of the court.

The information in this case consisted of two counts both charging the defendant with the crime of aggravated assault and battery. The first count was in the language of the statute (Ill. Rev. Stat., chap. 38, par. 56a). The second count charged that the defendant, on the 29th day of December, 1955, at and within the County of LaSalle and State of Illinois aforesaid, did unlawfully and violently assault, beat, wound and ill-treat, and did other wrongs and injuries inflict on and to Keith Chapman by striking the said Keith Chapman with his fists and by kicking him with his feet about the head, face, neck, arms, shoulders, back, stomach and legs, thereby inflicting severe wounds, contusions,

bruises, cuts and lacerations, and thereby resulting in severe personal injuries to the said Keith Chapman.

The defendant entered a plea of not guilty and the issues thus made were submitted to a jury resulting in a verdict finding the defendant guilty of the crime of aggravated assault and battery and the verdict fixed the punishment of the defendant at imprisonment in the county jail for a term of nine months and imposed a fine of $50. After overruling motions for a new trial and in arrest of judgment, the court rendered judgment on the verdict and the record is before us for review.

The evidence disclosed that Keith Chapman, the prosecuting witness, was employed by the Tucker Insurance Agency with offices in Ottawa and had been so employed for ten years; that defendant had been a customer of that agency since 1952 and had procured from the Tucker Agency an insurance policy on his automobile which had been renewed from year to year. On October 7, 1955 this policy expired and following a telephone conversation with the wife of defendant a new policy was issued and shortly prior to the expiration date of the old policy the new policy was sent by mail to the home of the defendant. On December 27, 1955 the policy not having been paid for or returned to the Insurance Agency, Mr. Chapman went to the home of the defendant to pick up the policy as he had been advised by the defendant over the phone that he, the defendant, had purchased a new car and in financing it had made other arrangements for insurance.

At the visit to defendant's home on December 27, 1955, defendant's wife was unable to locate the policy after a brief search and Mr. Chapman requested her to make a further search and told her that he would come back in a few days. He explained to her it was necessary that he return the policy to the company

283

which issued it, as it had been charged to him and was considered as outstanding and in full force and effect until it was returned.

Two days later, December 29, 1955, at about seven o'clock in the evening Chapman returned to the home of the defendant, accompanied by his wife and two infant children. He stopped his car in the driveway and went to the kitchen door, where the defendant's wife met him. He stepped into the kitchen and there saw the defendant sitting at a table with three other men whom he did not know. Chapman spoke to the defendant and inquired of Mrs. Cavanaugh whether she had been able to find the automobile policy in question. She told him she had not and he asked her to look again and stated that he would come back a few days later. At this point, the defendant arose from his chair and approached Chapman and according to the testimony of Chapman, the defendant said to him, "I don't know whether you have to ever come back. Get out of here and stay out." Chapman was standing just inside the kitchen door and according to his testimony this is what occurred: "I opened the door to leave, as he told me to and the next thing I knew he hit me in the face and I was laying on the floor, face down and had quite a pain in my left side. Then I put my hand up to my face, and my nose grated. I knew it was broken. I struggled to my feet and I was struck several more times. There was a babble of voices. I heard someone say that is enough, let him alone but he grabbed me by the front of the coat and threw or pushed me out. As I went past, I saw him put his left leg out to kick, I tried to hurry and on the way out to the step he grabbed me by the shoulder blade. I did the best I could to get out of the garage and he caught up with me and hit me some more times. I did the best I could to get around in front of the car. I

ran to the driver's side of the car and I attempted to open the door. I had it partially open and he hit me several more times in the face and nose. I was rather dazed. I knew I couldn't get in the car so I tried to push him off of me, then he came back and I grappled with him. We both stumbled and fell and rolled down the driveway toward the street. A little later they dragged him off and led him away."

Chapman was driven home by his wife and immediately taken to the hospital where he remained for two days. His nose was broken in two places, his eyes were blackened, his lips were cut, several teeth were loosened, his left hand and back were lacerated and his left knee was injured and his ribs and chest were bruised. Pictures of Chapman in the record, which were taken soon after the difficulty, indicate the extent of his injuries and from these, the testimony of the attending physician and his own testimony it is apparent he was severely injured about the face and head and suffered substantial injuries.

Rosemary Chapman wife of the prosecuting witness testified that when she and her husband arrived at the home of the defendant on the evening in question her husband parked the car in the driveway and she remained in the front seat of the car with her six-months-old baby on her lap. She testified that her husband was only in the house one or two minutes; that when the door again opened she noticed that the defendant was hitting her husband who was "stumbling around in a daze"; that in addition to the defendant there were three other men there; that she got out of the car with her baby in her arms and she heard one of these men say "Floyd that is enough" and these other men took hold of the defendant; that the defendant was using profane language and that she, Mrs. Chapman, told these other men that they could hardly call themselves

men when they just stood and watched such a brutal beating; that after she said this the other men pulled the defendant off of her husband and she and her husband left and she drove the car to their home.

The defendant testified that on December 27, 1955, Mr. Chapman came to his home and introduced himself and they shook hands and Chapman told him that he, defendant, had to pay for the two months the policy was in force and wanted the policy back; that defendant told him he didn't know the policy had been written and that his wife had looked for the policy and couldn't find it but defendant said he would be back to-morrow night.

The defendant further testified that Chapman came back on the evening of December 29, 1955 while he was eating supper; that Chapman walked in the kitchen door without knocking and asked his wife if she had found the policy and she said "no" and Chapman then said he would be back the following night. As abstracted defendant then said: "Listen, you don't have to come back to-morrow night, or any other night. I had enough trouble about the policy." Chapman then replied: "Our company sold you insurance before that on time, they did business that way. I think your wife is lying about it. I think you have the policy here." Thereupon defendant testified he got up from the table and told him (Chapman) "to get out right now": that Chapman then hit defendant on the shoulder with his left hand. "It hurt a little," continued the defendant. "It spun me back beside the chair. I got up and hit him once. He went down. I followed him out to see he wouldn't make any more trouble. I said, 'I don't want you back here no more': Chapman kicked me in the middle section. I went down a little bit. We clinched and wrestled. There were no blows struck in the yard. He just kicked me. When we were pulled apart by Fox

and Lenac, Mrs. Chapman was cussing me and calling me a dead beat, and an obscene name and said pay your bills."

Theodore S. Lenac, Charles Freeman and Robert Fox were the three gentlemen sitting at the table with defendant in defendant's home upon the evening of December 29, 1955 and they testified in behalf of defendant, corroborating in some particulars defendant's testimony.

The deputy sheriff testified in rebuttal that shortly after the occurrence, after he had arrested defendant and while they were on their way to the jail with the defendant, he, the deputy sheriff, asked defendant what had happened and defendant replied: "How would you like to have this insurance man come to your place and call your wife a liar about an insurance policy." The deputy sheriff then inquired of defendant: "Did he call your wife a liar?" and the defendant replied, "No, he didn't call her a liar, but he looked at her like she was lying." The deputy sheriff then said to defendant that he couldn't beat a man up "for the way he looks at you" and inquired of defendant if he had been drinking and the defendant said, "No, I just had a couple of drinks that afternoon."

Counsel for plaintiff in error, states that the record in this case is devoid of any evidence upon which an aggravated assault can be predicated and insists that it was error for the court to instruct the jury that an aggravated assault is the unlawful and violent beating of another which results in severe personal injury as defined by the Criminal Code (Ill. Rev. Stat., chap. 38, par. 56a) without giving to the jury a definition of a simple assault and battery as being the unlawful beating of another according to the provisions of the statute (Ill. Rev. Stat., chap. 38, par. 56).

287

 It is well established that it is not reversible error to omit to define a lower degree of crime than that which is charged, where the information, in charging the greater offense, includes facts which constitute the lesser offense, in the absence of a request to do so by the defendant. (Dunn v. People, 109 Ill. 635, 646; People v. Rozanski, 268 Ill. 607, 612; McDonnall v. People, 168 Ill. 93.) It was not the duty of the trial court to give such an instruction on its own motion. If the defendant desired such an instruction, he should have tendered it. (People v. Weisberg, 396 Ill. 412.) In the instant case, however, the court advised the jury that in case it found the defendant guilty of an assault and battery the punishment therefor was a fine not less than $3 and not more than $100 and submitted to the jury an appropriate form of such a verdict. We have read the evidence found in this record. It was sufficient to warrant the giving of an instruction in the language of the aggravated assault and battery statute which was the offense charged in the information. The jury heard the testimony of all the witnesses and, having found the defendant guilty and imposed upon him a penalty within the limits prescribed by the statute, we would not be justified in disturbing its finding.

██ The defendant also insists that the language used in the aggravated assault and battery statute is so vague and indefinite that no court is able to determine with any reasonable degree of certainty just what the legislature intended and therefore the statute must be held to be inoperative. Counsel insists that the phrase "severe personal injury" is so uncertain and vague that it cannot be determined just what would constitute a violation of it. The term "severe personal injury," as used in this statute, may not be susceptible of a precise definition, yet it implies an injury of a much more grievous and serious character than that

implied by an ordinary battery. Whether the injury sustained and the facts surrounding the commission of an offense would bring the offense within the meaning of Paragraph 56a or Paragraph 56 presents a question of fact for a jury to determine.

In Murphey v. State, 43 Neb. 34, 61 N. W. 491, the phrase "great bodily injury" was under attack for the same reason as is urged here against the phrase "severe personal injury." The court there found that it was sufficiently definite and, in the course of its opinion, said: "The cases which appear to sustain a different view arose, it is believed, without exception, under statutes in which the manner and form of the assault or the instrument used is included within the definition of the offense. The term 'great bodily injury,' as employed in the statute, is perhaps not susceptible of a precise legal definition. It is, however an injury of a graver and more serious character than an ordinary battery; and whether a particular injury is within the meaning of the statute is generally a question of fact for the jury and not of law. See State v. Gillett, 56 Iowa 459, 9 N. W. 362."

At the trial, Dr. Jerry De Vries testified on behalf of the People that on December 29, 1955, he was called to the Ryburn Hospital where he attended the prosecuting witness, Keith Chapman. He said he found him sitting on an examining table with his head over a pan, his nose bleeding from both nostrils and his face battered; that he examined his wounds and found that his nose was broken in two places and that he had a cut lip over the incisor tooth; that both eyes were blackened. He said that Chapman's left hand had excoriations at the knuckle and the base of the thumb; that he had little spots over the ribs, left knee and left chest, "abrasions like you would find if you brushed against gravel or sand." Counsel for the People during the

289

examination of this witness then asked this question: "Now, you have an opinion, based upon your medical practice over an extended period of time, as to the source of the injuries to Mr. Chapman's left hand?", and he answered, "I would say that he had all the evidence of having been—well, the common expression 'pommelled', but I might say, if the Honorable Judge would allow me, I would say that even if I couldn't ascertain from the injuries, my confidence in Keith Chapman's integrity . . . ." Counsel for the defendant interrupted and said, "Now wait a minute, for cripe's sake. You want to get on the jury, Doctor?" The court then said: "Objection sustained." At the conclusion of the direct examination of this witness the court said: "with regard to the comments of the witness concerning the complaining witnesses' integrity and so forth, the jury will be instructed to disregard the comments of the doctor in that respect and the answer will be stricken as not responsive."

■ Counsel for defendant insists that this statement of the witness concerning his confidence in Chapman's integrity was highly prejudicial and partially responsible for the verdict of guilty returned by the jury. This remark of the witness was unresponsive to the question asked and a voluntary statement by the witness. The court promptly sustained the objection and struck the testimony from the record and directed the jury to disregard it. Similar instances occur in many contested trials. There are, of course, instances where voluntary and unresponsive remarks are highly prejudicial and require reversal. In this instance, however, the striking of the unresponsive answer and instructing the jury to disregard it provided adequate protection to the defendant.

Counsel for defendant also insists that the trial court erred in giving to the jury, at the request of the People,

290

Instructions 7, 9, 11, and 12. Instruction No. 9 told the jury that if "you believe from the evidence, as produced by the defendant, that Chapman made the first attack upon the defendant, still, if you further believe that the said Chapman afterwards ceased to attack the defendant and proceeded to leave the defendant's premises, and that the defendant followed after Chapman and continued assailing him when Chapman was not making any attack upon the defendant, then you are instructed that the defense of necessary self-defense is not established in law."

■ It is insisted that the ninth instruction assumed that the defendant followed Chapman and continued to assail him and, after so assuming, the instruction told the jury that the defense of necessary self-defense was not established. While this instruction singles out the evidence produced by the defendant and in a later portion of the instruction does not confine the jury to the evidence produced upon the trial, the import of the instruction is that if the jury believed from the evidence that Chapman made the first attack but afterward ceased and proceeded to leave the premises of the defendant, but that defendant "followed after him and continued assailing him when Chapman was not making any attack upon the defendant," then necessary self-defense was not established as a matter of law. There were other instructions relating to self-defense which the court gave and to which counsel directs no criticism. Furthermore, the court gave every instruction tendered by the defendant, and, while we do not approve this instruction, we do not believe the judgment should be reversed because of it.

■ ■ Instruction No. 11 is as follows, viz.: "You are instructed that the law of self-defense, as the same is defined in these instructions, does not imply the right of attack in the first instance, nor does it permit

291

of action done in retaliation or for revenge." Counsel insist that this instruction was contrary to the evidence as the evidence of the defendant was that Chapman struck defendant in the first instance. The testimony of Chapman, however, was otherwise and the state was entitled to have the jury instructed in support of its theory if there was evidence to support such theory. (People v. Scalisi, 324 Ill. 131; People v. Khamis, 411 Ill. 46, 53.) While there would have been no error had this instruction been refused, there is evidence in this record to the effect that defendant was the first assailant and that his conduct was prompted by a spirit other than that of self-defense. Under the evidence it was not reversible error to give this instruction. (People v. Battaglia, 282 Ill. 91; Morello v. People, 226 Ill. 388, 400.)

Instruction No. 12 stated "that if a person enters another's premises quietly and with consent, the owner cannot justify turning him out without a previous request to leave."

Counsel state in their criticism of this 12th instruction that as applied to the facts disclosed by this record, Chapman entered the home of the defendant "quietly and with consent" of the defendant; that defendant ordered him to leave and he did so. Counsel insist, however, that this instruction ignores all the evidence and took away from the defendant his defense of self-defense and that the jury was, by this instruction, misled and prejudiced against the defendant. The instruction is an abstract proposition and should have been refused. We do not believe, however, that it took away from defendant his defense of self-defense and when considered with other given instructions defendant was not prejudiced thereby.

Counsel state that the Supreme Court in People v. Durand, 307 Ill. 611, at p. 621, condemned an instruc-

292

tion of the character of People's Instruction No. 7. This instruction is as follows, viz.: "You are instructed that a person is privileged in law to employ force, if necessary, in his own self-defense; that only such force as is necessary for protection is authorized." This instruction was followed by People's Instruction No. 8, which told the jury that before a defendant can avail himself of the right of self-defense, it must appear to him, acting as a reasonable person, that at the time of the attack the danger to him or his family was apparently so urgent and pressing that his action was necessary in order to prevent bodily harm to the defendant or his family. Then follows Instruction No. 9, set out in this opinion, and Instruction No. 9 was followed by People's Instruction No. 10 and this instruction told the jury "that a person has no right to use any more force in self-defense, as the same is defined in these instructions, than he, acting as a reasonable person, would deem necessary under like circumstances." These instructions were followed by the first given instruction offered by defendant, which told the jury that "these instructions are given and should be considered as one entire series and each instruction should be considered in connection with all instructions bearing upon the same subject." The Durand case does not hold that the instructions given in the instant case were erroneous and require the reversal of this judgment. Taken as a series and not being directive or peremptory in form we do not believe counsel's criticism of the several instructions complained of is justified. The record discloses that the court gave fourteen instructions offered by the People and twelve offered by the defendant. One instruction offered by defendant was refused, but it was covered by another given instruction and no complaint is made of the action of the trial court in so doing.

293

Some of the given instructions were more favorable to defendant than he was entitled to and taken altogether we do not believe defendant has any just cause of complaint.

Counsel for defendant finally insists that the rights of the defendant were prejudiced by the continued use of leading and suggestive questions by the Assistant State's Attorney who tried the case. The record does disclose that a number of leading questions were asked. It also shows that when objection was made the court, in most instances, sustained the objection and if the question had been answered the court struck the answer and directed the jury to disregard the same. This is about all that can be done.

The evidence was conflicting, but the jury heard the testimony of the several witnesses and resolved the conflicts in the testimony in favor of the People and against the defendant. The jury did not believe the version which the defendant and his friends gave of what transpired on the night of December 29, 1955. The defendant positively testified he hit Chapman only once; yet, the pictures in the record show that he was severely beaten about the head and face. No jury could be expected to believe that such injuries were inflicted by one blow. There are other instances of inconsistencies found in the record which would incline a court or jury to disbelieve defendant's version of this occurrence.

We have read this record and cannot say that the jury's verdict is based upon compassion for the prosecuting witness or passion or prejudice against the defendant. The evidence shows that Chapman was severely and seriously beaten. The jury, by its verdict, found that there was an aggravated assault and no justification therefor and the trial judge has approved that verdict. The record is not free from error, but

294

that is not required. No substantial right of the defendant has been invaded. He has had a fair trial and the judgment of the trial court should be and is affirmed.

Judgment affirmed.

CROW, J., concurs.