Daniel L. Gilday was indicted in the criminal court of Cook county for an assault with a revolver upon Herman Knol with intent to murder him. Upon a trial by a jury he was found guilty and sentenced to imprisonment in the penitentiary, and he prosecutes this writ of error from the judgment. *Page 13 
It is claimed that the indictment should have been quashed because it did not allege by what means the assault was committed; that the court erred in allowing a peremptory challenge of two jurors by the prosecution, in admitting evidence that the defendant shot and wounded the prosecuting witness, and in admitting in evidence a pistol, a tear-gas gun and certain stars found on the defendant; that no specific intent to kill was proved; that the court erred in giving and refusing instructions, and that the State's attorney was guilty of such misconduct on the trial as to deprive the defendant of a fair trial.
The indictment merely charged the defendant with making an assault with a revolver, without saying whether it was loaded or not or whether the defendant shot it or used it as a club or in any other way. The assault and intent were well enough charged and the manner of the assault was to be shown by the evidence. No motion for a bill of particulars was made showing circumstances which made more particular averments necessary to enable the defendant to understand the nature of the charge against him or to prepare his defense. It is clear that the defendant was not hampered in his defense for want of a fuller statement of the offense charged.
Gilday was sixty-six years old and weighed about 140 pounds at the time the events in question occurred, November 29, 1931. Dr. J.W. Edwards testified that Gilday had been his patient since April, 1930; that he had a condition of extremely low blood pressure, giving rise to attacks of dizziness, and had arteriosclerosis; that there was no reason for the attacks of dizziness coming as they did; that occasionally intense excitement would bring them on; that he was treating Gilday for hardening of the arteries and advised him to take whisky daily but did not prescribe it. Gilday had been an insurance broker and had been for eight years a director of the Better Government Association. He had been an investigator for the Englewood Law and Order *Page 14 
League, which had gone out of existence four years before the trial. He was an investigator under Patrick Roche, chief investigator for the State's attorney of Cook county, on a salary which was paid by the county, and had worked with Palmer Anderson from time to time when Anderson was United States marshal. As investigator for the State's attorney he had received from Roche, the chief investigator, about two weeks prior to the shooting, a star as a badge of his office. He had also been given a police star at the direction of the chief of police of the city of Chicago at the time he was engaged in the work of the Englewood Law and Order League. He had a tear-gas gun in the form of a fountain pen which Anderson had given him, and a pistol which had been given him in connection with his work. In the course of the preceding four or five years several hundred places had been closed as the result of his work as an investigator. At the time of the shooting he had on his person the two stars, the pistol, the tear-gas gun and a pint of whisky, and he was intoxicated, or apparently so.
The shooting occurred at about 7:30 in the evening of November 29, 1931, at the intersection of Seventieth and Green streets. Gilday testified that during the afternoon he had left his home at about 3:00 o'clock and gone to the Englewood police station, at Sixty-third street and Went-worth, where he had a conversation with Captain Lee. He then went by street car to Sixty-third and Halsted, and from there walked to Fifty-ninth and Halsted looking for a speakeasy run by Thomas Buggy, which he finally found. Buggy was absent but later came in, and the two sat at a table in a private booth and drank some intoxicating liquor. Gilday was seeking information as to some kidnappers. From Buggy's he went to a speakeasy of Henry Hoffman, at Sixty-ninth and Halsted, but the door was locked, and he went to Sixty-ninth and Peoria looking for a man by the name of McCabe, whom he did not find. He thought he then *Page 15 
walked along Sixty-ninth street to Halsted. He felt dizzy and also felt the effect of the liquor he had drunk. Witnesses who saw him as he neared Halsted testified to circumstances which gave him the appearance of being badly intoxicated, and they thought he was. The decided weight of the evidence was that he was intoxicated.
At Seventieth and Halsted streets two young men, Herman Alkema and Herman Knol, eighteen and seventeen years of age, respectively, walking north on Halsted to go to the Open Door Mission at that corner, saw Gilday. They testified that he was staggering, and they asked if they could help him. He said yes. They asked where he lived, and he said "over there." Supporting him, one on either side, they walked with him to Green and Seventieth streets. They testified in substance that there Gilday drew his pistol and pointed it at Alkema, who started to run. He then pointed it at Knol's chest. Knol seized the pistol and Gilday's hand and tried to push the pistol from him. Both having hold of the pistol it was discharged, the bullet striking Knol in the abdomen, perforating his bowels in several places and passing out of his back. Gilday testified in substance that one of the boys said to him, "Give us what you have got;" that he drew the pistol, intending to scare them; that one of them grabbed it and in the scuffle the pistol was discharged; that he never intended to harm but only wanted to scare them. At the sound of the shot Alkema ran to a neighboring drug store and called the police. Frank E. Fenneman, at his home, 6958 Green street, heard the shot, and looking out of the window saw two bodies lying in the street. He went out and the young man lying there said, "Take that gun off that man." Fenneman took the pistol from Gilday's hand and asked if he shot the boy. Gilday said yes, and in response to Fenneman's question what he shot him for, asked Fenneman's name. Fenneman asked him what he wanted to know for, and Gilday answered, "Because you got my gun and I want to know who has got it." *Page 16 
Fenneman had to get close to hear Gilday and smelled the odor of liquor. Gilday's tongue was very thick, he was incoherent and indistinct and his eyes were glassy and bloodshot. Francis Hannan, who was driving an automobile, stopped and took the boy to the hospital. Fenneman turned Gilday over on his back, picked him up and set him on the curb-stone. A police squad car came. Two of the policemen had at one time been assigned to guard Gilday's home and knew him. Walter Lyons, one of the policemen, asked, "What is the matter, Mr. Gilday?" Gilday answered, "Oh, I got one of them." Lyons asked, "One of who? Where is he?" Gilday said, "I do not know." Lyons asked, "Did you shoot somebody?" Gilday said, "Yes." Gilday was taken to a hospital and then to a police station.
Gilday proved by many respectable and credible witnesses that his reputation was good as a peaceable and law-abiding citizen.
In an indictment for an assault with intent to commit murder, the allegation of the intent with which the assault was committed is material and the People must prove the specific intent alleged beyond a reasonable doubt. (People v. Herbert,340 Ill. 320.) It is the main contention of the plaintiff in error that there was no proof of any specific intent to kill, and the verdict was therefore without evidence to support it. It seems evident from the testimony, the contradictory accounts of the occurrence at the time of the shooting given by the plaintiff in error and the two boys who participated in it, that the question of the intention of the plaintiff in error was manifestly one upon which the verdict of the jury must be conclusive and that the judgment ought not to be reversed unless prejudicial error occurred on the trial. If the young men demanded that Gilday give them what he had and he believed they intended to rob him he had a right to defend himself against their anticipated attack, and if in doing so he wounded or killed one or both of them he would be guilty of no crime. On the other *Page 17 
hand, if he made the assault with the pistol on them as they testified and had the intention to kill them he would be guilty of the crime charged in the indictment. The questions of fact were for the jury to determine whether Alkema and Knol demanded of Gilday what he had or Gilday made an assault upon them, whether Gilday intentionally fired the pistol or it was accidentally discharged, and whether, if he intentionally fired the shot, he intended to kill Knol. The degree of Gilday's intoxication and its effect on his mental processes were questions of fact to be determined from the evidence. His reply, "Oh, I got one of them," to Lyons' question what was the matter, and his affirmative reply to the question, "Did you shoot somebody?" tend to prove that he understood what had occurred and perhaps to show his intention.
It is contended that the court erred in the instructions given at the request of the People and in refusing an instruction requested by the plaintiff in error.
The defense was based upon the testimony of the plaintiff in error that Alkema and Knol came up behind him, one on either side, and walked along with him, and then one of them said, "Give us what you have got." He took the pistol out of his coat pocket intending to scare them. There was a scuffle and in the scuffle the pistol was discharged. He fell down, and the next thing he knew, officer Lyons came there and said, "Look here; here is a pint in his pocket." That was the first time he saw the bottle. Knol was a stranger to him and he never had any intention of doing him any harm. He was horrified when it happened. He could not account for the time spent after he left home until this happened and he was intoxicated. This was his account of the occurrence, and it presented two questions which he had a right to have submitted to the jury on proper instruction: First, was he justified in drawing his pistol to protect himself from an apparent attempt to rob him; and second, was he so drunk that the condition of his mind was *Page 18 
such that he was incapable of forming any intent whatever. Drunkenness was no excuse at common law for a crime committed, and our statute declares it to be no excuse for any crime or misdemeanor unless such drunkenness be occasioned by the fraud, contrivance or force of some other person for the purpose of causing the perpetration of an offense. It is therefore the rule in this State that voluntary intoxication is no excuse for crime. There is, however, an apparent exception to this rule which is as well recognized as the rule itself and applies in cases where the law requires a specific intent as an essential element of the crime. In such cases, if the alleged perpetrator of the crime is intoxicated to such a degree as to be unable to form any intent the crime charged has not been committed. (Crosby v. People, 137 Ill. 325; Schwabacher v. People, 165 id. 618; People v. Bartz, 342 id. 56.) The exception is only apparent, for if the law declares the act criminal only if committed with a specific intent, proof of the act without proof of the intent is a failure to prove the crime. The plaintiff in error's testimony presented a case calling for the application of these rules of law, and he had a right to have the jury instructed as to the law applicable to the facts which his evidence tended to prove. The court, however, completely ignored this aspect of the case and gave these instructions to the jury:
1. "If the jury believe, from the evidence, beyond a reasonable doubt, that the defendant pointed the revolver at the said Herman Knol, as charged in the indictment, and discharged the same either with malice aforethought or with a reckless and total disregard of human life, and that the use of the said weapon, as used by the said defendant was likely to kill the said Herman Knol, then the said defendant is guilty of an assault with intent to commit murder.
2. "If a sane person fires a revolver at or towards another, either with malice aforethought or with a total disregard *Page 19 
of human life, he may be convicted of an assault with intent to kill and murder the person so attacked.
11. "The court instructs the jury, as a matter of law, that every sane person is presumed to intend the usual, natural and probable consequences or effects of his willful act and is responsible therefor."
Instruction 3 was further erroneous in making the test of guilt the defendant's knowledge of right and wrong and his mental capacity to choose to do the act or acts constituting the crime charged and to govern his conduct in accordance with his choice. No claim of insanity was made in behalf of the defendant, and the minds of the jurors should not have been diverted from the question of "intent to murder," which was in the case, to that of insanity, which was not. The instruction was as follows:
3. "The court instructs the jury, that if from all the evidence in the case you believe beyond a reasonable doubt that the defendant committed the crime of which he is accused in manner and form as charged in the indictment, and if you further find from the evidence beyond a reasonable doubt that at the time of the commission of such crime the said defendant knew that it was wrong to commit such crime and was mentally capable of choosing to do the act or acts constituting such crime and of governing his conduct in accordance with such choice, then it is your duty under the law to find him guilty, even though you should believe from the evidence that at that time he was under the influence of intoxicating liquors."
Instruction 12 also fails to require proof of the essential element of the intent to murder, and the question whether the plaintiff in error was making an effort to defend himself against an apparent attempted robbery. It was as follows:
12. "The court instructs the jury, as a matter of law, that if you believe from the evidence, beyond a reasonable *Page 20 
doubt, that the defendant committed the assault as alleged in the indictment, and if you further find from the evidence in this case, beyond a reasonable doubt, that such assault was committed deliberately and was likely to be attended with dangerous consequences, the malice, or intent, requisite to make out the case as charged will be presumed."
The intent to make out this case was the intent to murder, while the intent required by the instruction may have been an intent to do bodily injury, only, even though an assault was committed deliberately and was likely to be attended with dangerous consequences.
The court gave the following instruction:
13. "The court instructs the jury, in the language of the statute, that drunkenness shall not be an excuse for the crime or misdemeanor, unless such drunkenness is occasioned by the fraud, connivance or force of some other person, for the purpose of causing the perpetration of an offense, in which case the person causing such drunkenness for such malignant purpose shall be considered principal and suffer the same punishment as would have been inflicted on the person committing the offense if he had been possessed of sound reason and discretion."
It eliminated entirely the matter of the intoxication of the plaintiff in error as an element to be considered in relation to proof of the intent alleged in the indictment and was therefore erroneous. It sustained the position of the State's attorney in his closing argument, in which he had impressed upon the jury his view in the following language: "Our law is that voluntary drunkenness is never an excuse for a criminal commission, and you need not follow Scott Stewart's idea of it either. Voluntary drunkenness as to murder, whether it results in insanity or not, is no defense to murder, but insanity produced by long-continued drinking, resulting in a form of permanent insanity, is the protection that the law holds out to such an unfortunate individual who would happen to commit a particular offense *Page 21 
without any possible chance of knowing the fact or the nature of his or her commission. That is our law."
The court gave an instruction asked by the plaintiff in error which stated the rule in regard to the effect of intoxication upon the question of intent correctly. The instructions given at the request of the People ignored this rule and directed a verdict and were therefore inconsistent with the instruction for the plaintiff in error. We have frequently held that the giving of contradictory instructions to the jury will require the setting aside of the verdict, because it cannot be known whether the jury followed the correct or the erroneous instruction.
It was not erroneous to allow the pistol from which the bullet was fired to be introduced in evidence, but the State's attorney's star and the police superintendent's star and the fountain pen tear-gas gun which the plaintiff in error had in his pockets should not have been admitted. They had nothing to do with the occurrence and their possession had no tendency to prove the commission of any crime or throw any light upon what occurred.
The plaintiff in error asked an instruction telling the jury that the indictment charging an assault with intent to kill contained a charge of the less offense of assault; that the defendant was entitled to the benefit of any reasonable doubt in regard to the grade or degree of the offense charged, and where there is any reasonable doubt as to the degree, if any, he should only be convicted of the less degree. The instruction was refused, and this was error. It is a general rule of the criminal law that it is sufficient to prove so much of an indictment as shows that a defendant has committed a substantive crime charged. So, when the offense charged in an indictment includes within it another offense of lower degree, and the evidence is contradictory in regard to the degree of the offense actually committed, the defendant may be convicted of the offense of less degree even though the evidence fails as to the offense of higher degree. (Stewart *Page 22 
v. State, 5 Ohio, 145; People v. Dugas, 310 Ill. 291.) It is the province of the jury to find the facts proved, and it was the right of the defendant that the jurors should be advised that it was their duty to determine what crime charged in the indictment was proved, if any, and to give him the benefit of any reasonable doubt on that question.
Just complaint is made of the misconduct of the attorneys for the prosecution in their arguments to the jury. They proceeded to arraign the Better Government Association, of whose board of directors the plaintiff in error was a member, as if it were on trial, and to denounce its methods of law enforcement, which were not in issue, and permitted the argument to degenerate into a bitter tirade against reformers, and particularly the Better Government Association, on whose future it was stated the outcome of this case would have a very grave effect. The future of the Better Government Association and the methods of reformers were not matters of concern in the consideration of the issue in this case, which was, Did the defendant assault Knol with the intention of murdering him or did he believe that Alkema and Knol were about to attempt to rob him, and did he do what he did in the belief that it was necessary to protect himself from an apparent attempt to rob him? Whether the trial judge believed or did not believe the plaintiff in error's version of the events in question and whether or not we believe it, the defendant had the right to have the question of fact submitted to jurors, the triers of fact, properly instructed by the court as to the principles of law applicable to the facts upon the version of the occurrence testified to by the defendant. Upon another trial the abusive and improper argument indulged in on the trial now under review should be avoided.
The judgment is reversed and the cause remanded.
Reversed and remanded. *Page 23