THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LENROE TAYLOR, a/k/a LENORE TAYLOR, Defendant-Appellant.

(No. 54568; ■■■■■■■■■■■■■■

First District—September 10, 1971.

1054

Gerald W. Getty, Public Defender, of Chicago, (Marvin Lanzel, Senior Law Student, and Shelvin Singer and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and John A. Gibaitis, Assistant State's Attorneys, of counsel,) for the People.

Mr. PRESIDING JUSTICE ENGLISH delivered the opinion of the court:

*OFFENSE CHARGED*
Murder. Ill. Rev. Stat. 1967, ch. 38, par. 9—1.

*JUDGMENT*
After a bench trial, defendant was found guilty and sentenced to a term of 20 to 35 years.

*CONTENTION RAISED ON APPEAL*
Defendant was not proven sane at the time of the crime.

*EVIDENCE (HEARD AT THE TRIAL ON JULY 8, 1969)*
*Darlene Stevens,* for the State:
She was 12 years old at the time of the trial and lived with her father and three brothers at 844 W. 78th Street. On August 27, 1967, about

10:00 P.M., she went to bed in the bedroom with her three brothers. Her mother was in the front room watching television. She went to sleep, but awakened later. Defendant, whom she knew because he used to stay with her mother, knocked on the door, and her mother answered it. After he came in the door, he took a knife out of his back pocket while he was in the back room. He went into the front room,where there was a light on, and knocked her mother down. Her mother had not done anything prior to being knocked down. He then stabbed her many times. The witness ran into the hallway and tried to summon the people next door, but no one answered. While she was in the hall, defendant ran out. Her mother came out and fell in the hallway. Her brother had gone for the police.

*William Boreczky,* for the State:

He is a police officer who was present when defendant entered the police station and surrendered himself and a pair of scissors on August 28, 1967. Defendant said he killed Maude Stevens, but did not want to talk about it further.

*Stipulation,* for the State:

If a coroner's pathologist were called, he would testify that he examined the body of the deceased and found multiple stab wounds; that her death resulted from a stab wound of the chest and heart.

*Lenroe Taylor, defendant,* in his own behalf:

He was brought up by various aunts, friends, and a stepfather in Alabama, where he also spent three years in a reform school. He was in the Marine Corps for one year and was discharged after being examined by some doctors who told him he was unfit for duty because he was a schizophrenic. He then returned to a ghetto where he tried to escape from Negrophobia, a fear of being black. Subsequently, he joined the Air Force, but was court-martialed and dishonorably discharged nine months later after he got drunk and shot up the Airmen's Club.

He had been released on sick leave from his job at American Can. He was going to have an operation for a rupture on August 28, 1967, and was afraid of the pain. This fear resulted from the fact that when he was small, he received many whippings from his stepfather and various people. On one occasion, his stepfather pulled a knife on him. He also had a knife and fought with his stepfather, who was killed as a result of this, he thought, but did not remember. He was under the influence of alcohol at that time.

On the night of August 27, 1967, he received a phone call from Maude Stevens and went to her house that night. He had a key and let himself in the front door. The children were sleeping, and he and deceased were sitting up talking. He was afraid of the operation and had been drinking

for three or four days. The deceased got him a beer and they talked some more. Then he told her that he was sleepy and wanted to lay on the couch. She told him if he could not sleep in the bed with her, he should leave. He had lived with her "common law" for six years and they had one child. They started to argue and deceased woke up her son, telling him to go get the police because defendant would not leave. Defendant had snatched out the telephone. She was screaming and hollering, and he was shaking her, and the next thing he knew, he felt a severe shock of pain as she kicked him with her knee in the groin area where the operation was supposed to be, and he saw a blinding flash of light. He also remembered her coming at him with a sharp object, which he later realized were scissors. The next thing he knew, he heard deceased's daughter screaming, "You cut my mother." When he looked around, he saw blood spots on deceased. He picked up the scissors, which he had heard drop to the floor, and left the scene. He took the scissors so that if she said anything to the police he could say she tried to stab him with the scissors. He saw her son standing on the corner, and told him to go home. When the daughter had screamed, he discovered he had a knife in his hand. He threw the knife in an alley, and went to a friend's house. The following morning he learned on the radio that Maude Stevens had died, so he turned himself in to the police. He wanted to die himself.

He was in jail waiting trial for almost two years. Once, while in jail, he attempted to commit suicide by taking about 50 pills he had been given for a rash. He thought all hope had been lost for "our cause" on account of the assassination of President Kennedy, Robert Kennedy, and Martin Luther King; he had no money or friends. Also, while in jail, he had some mental disturbance, thought he was in the Marines again, and was put in a cell with what they called "psychos" for about four months. There, he began writing poetry. He attempted to sell some of his poetry, and corresponded with Reader's Digest and Look Magazine. He also wrote to various high ranking government officials (Senators, members of the Cabinet and the U.S. Supreme Court), "A letter to America, a voice from the ghetto by way of the Cook County Jail," about an organization he called "King's New Breed of Brotherhood," dedicated to achieving peace and brotherhood through love and support of the United States Constitution.

In response to a question on cross-examination as to what happened during the knife fight with his stepfather, he answered:

"You know, seemingly like I got discharged from the Marine Corps but I never discharged the Marine Corps, I always had that feeling, what you call semper fidelis, that's a Latin expression meaning always faithful and always true, and the gung ho expression means together-

ness. It seems that there was two of us, me and the Marine that never was, but I still retained that gung ho attitude, you understand, and then to get a job well done the Marine Corps adopted a Japanese attitude which is called a bonzai attitude, you understand, to get a job well done if you believe it's right.

When he fought with his stepfather, after they both pulled out knives, "confession prevailed." He was drunk at the time. When he drinks, he sometimes has different illusions. Sometimes he thinks he is a politician, sometimes a preacher, and he wonders if it was a "dream or was it so." He drank for four days and nights before killing Maude Stevens, so that his operation would not hurt so badly. Fear forced him to drink. He felt confusion at that time. When asked on cross-examination if he were still confused, he replied: "I feel like standing up and being counted now. I feel like an eagle now."

While in the service, he had been in the neuro-psycopathic ward but had never been committed to a mental institution. He had been picked up by the police on numerous occasions for drunkenness.

*Robert De Vito,*[1] for the defense:

After establishing his qualifications as an expert witness, he testified that he is a psychiatrist who examined defendant for more than two hours on April 17, 1969. Defendant was disheveled, anxious, and suspicious, thinking the witness might in reality have been a lawyer. He did, however, settle down and relate the facts of the case.

He found defendant to be a "very disturbed man," showing signs of grandiose thinking. Defendant also exhibited "loosening of associations," in that his thoughts did not follow in logical sequence. He was extremely suspicious and showed delusions of persecution. He also was easily irritated and, although he used words rather well, he had an unusual way of expressing himself, in that he misused words and used neologisms, which are nonexistent words or words he made up, having special meaning to him but which are hard for other people to understand. An example of this would be his use of the word, "immaculated," in the term, "immaculated law." In response to a hypothetical question (supplemented in a minor way, but otherwise without objection by the State) which included events from defendant's past to which he had testified, and the circumstances surrounding Maude Stevens' death, the witness testified that, in his opinion, based on a reasonable degree of medical certainty, the person described was suffering from mental illness; that he was suffering from a mental disease on August 28, 1967, as a result of which he

---

[1] On motion of defendant, the court entered an order on April 11, 1969, permitting Dr. De Vito to conduct a psychiatric examination of defendant "for competency and possible defense."

lacked the substantial capacity to "form the intent to commit the act," to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law. The witness also stated:

"A mental disease is a condition which by definition is an aberration from normality and it has a whole range of aberrations from normality, from very mild to very severe. In this particular case what we are referring to is that this man did not have the capacity to think logically, to recognize reality as it is, and to conform his behavior to law and reality as we know it."

There was a long-standing mental aberration on which was superimposed the effects of lack of sleep and heavy drinking. The fact that the man appears lucid and could answer questions in a courtroom would not affect the witness' diagnosis, since the lack of contact with reality may relate only to certain areas of deep concern or conflict in his life.

On cross-examination, the witness testified that he gave defendant a memory test which he performed capably. He also gave him various other tests. All of his information concerning defendant's past came from defense counsel and from defendant himself. He found that defendant related abnormally to his prison environment in that defendant considered himself as the poet in the cell block; that he was not really certain as to why he was in jail, regarding his purpose there to help the Negro problem in the United States, although he did know the charge he was facing. As a result of tests given, he found the defendant to exhibit dereistic thinking, which is the misinterpretation of reality with a delusional system built upon that misconception. For example, defendant's creed for King's New Breed of Brotherhood appears normal in general kinds of ways but in its specifics is incoherent if read carefully.

He did not agree that it would be difficult to determine a specific mental condition at a given point of time in the past. He felt that defendant was suffering from a functional non-organic psychotic illness. In the case of defendant, even though the facts as related by the hypothetical person with respect to both homicides were to be eliminated, he could still tell whether defendant was in contact with reality by his examination of defendant, and his diagnosis would have been the same. Nor would there be any difference if the drinking and lack of sleep were omitted. He based his opinion on both the hypothetical question and his examination of defendant. Also, his observation of defendant in court led him to believe that defendant, at the time of trial, was still suffering from the mental disease of delusions of grandeur and persecution which rendered him incapable of appreciating the criminality of his acts or conforming his conduct to the requirements of the law.

*William H. Haines,* for the State:

He is a physician and director of the Behavior Clinic of the Criminal Division of the Circuit Court of Cook County. He examined defendant twice, once on July 17, 1968, for a half hour and again on March 12, 1969, for 45 minutes. Both examinations were for the purpose of determining whether defendant was competent to stand trial. No tests were given to defendant. As a result of those interviews, he was of the opinion that defendant was not suffering from delusions of grandeur or persecution at those times. When asked on cross-examination whether, in his opinion based on his examinations, defendant was suffering from a mental disease or defect on August 27, 1967, the witness replied: "I have no crystal ball that I can look into to see the past." When asked if he could give an opinion as to defendant's sanity or insanity at the time of the offense, he answered, "I was not there at that time." He found defendant to have a schizoid personality make-up, which meant like a schizophrenic but not a schizophrenic, and "not entirely responsive to the situation." This did not mean that defendant was out of touch with reality. At the times of his interviews with defendant, his condition would have classified as a mental disease or defect in the diagnostic manual, but not one which rendered him unable to appreciate the criminality of his acts or to conform his conduct to the requirements of the law.

*OPINION*

Defendant's contention is that the State did not prove beyond a reasonable doubt that defendant was sane at the time of the crime. The defense of insanity is provided for under Ill. Rev. Stat. 1967, ch. 38, par. 6—2(a): A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. It is also declared to be an affirmative defense by Section 6—4. Further, section 3—2 provides: "(a) Affirmative defense" means that unless the State's evidence raises the issue involving the alleged defense, the defendant, to raise the issue, must present some evidence thereon. (b) If the issue involved in an affirmative defense is raised then the State must sustain the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all other elements of the offense. See also *People v. Gold,* 38 Ill.2d 510, 514.

Defendant, through his own testimony and that of Dr. De Vito, properly introduced "some evidence" of his affirmative defense, enough, in our opinion, to raise a reasonable doubt as to his sanity at the time of the crime. (*People v. Skeoch,* 408 Ill. 276, 280.) The only issue for us to

decide, therefore, is whether the State sustained its burden of proving beyond a reasonable doubt that defendant was sane at the time of the crime. Defendant urges that not only did the State fail to meet this burden, but that it offered no evidence whatsoever of defendant's sanity at the critical time in question. The State called Dr. Haines, who testified that he had no crystal ball which would permit him to see the past; that he "was not there at that time," and therefore, by inference, that he could not testify as to defendant's sanity or lack thereof at the time the offense was committed. This constituted the State's sole evidence in rebuttal to the positive testimony of defendant's qualified medical witness to the effect that defendant was not legally sane when he killed Maude Stevens.

The State relies principally on *People v. Count,* 106 Ill.App.2d 258, 262, in which Dr. Haines had testified for the State that no doctor could make an accurate assessment of defendant's impulses at the time of a crime committed 11 months earlier. The court there held this testimony was sufficient to support submission of the issue to the jury as against earlier defense testimony of a psychiatrist to the effect that the defendant was suffering from an irresistible impulse which deprived him of substantial capacity to appreciate the criminality of his conduct or to conform it to the law. For two reasons, the rationale in *Count* is not applicable here. First, in the instant case, Dr. Haines' testimony that he could not determine defendant's sanity at the time of the offense did not constitute an impeachment of Dr. De Vito's testimony that he could and did make such a determination and his opinion was that defendant was not sane. The State cannot at this time rely on the testimony of Dr. Haines in some earlier case and argue that such testimony now rebuts and impeaches Dr. De Vito's diagnosis and opinion. The court in the *Count* case found also that the defense testimony of irresistible impulse was rebutted by testimony of witnesses to the crime who described defendant's behavior and appearance at the time of the crime, and their description was contrary to the characteristics of a person suffering from the claimed mental defect as described by the defense psychiatrist who had also testified that such an irresistible impulse would last very briefly, "perhaps only a second or two." This latter testimony added immeasurably to the witness' difficulty or impossibility of diagnosis under the circumstances. Furthermore, the court pointed out that the fact that the defendant had arranged for a getaway car indicated that the crime had been preplanned and that defendant was not acting under any sudden irresistible impulse. Based on all of this evidence, the court concluded a jury could find the defendant was sane at the time of the crime beyond a reasonable doubt. *People v. Count, supra,* p. 263.

We consider that the *Count* case does not proclaim a rule of law that no doctor can properly testify to his opinion of a defendant's sanity at the time of the crime, based upon a subsequent examination. Surely, there are many cases where this has been done and upheld. See, for example, *People v. De Pompeis*, 410 Ill. 587, 590-592, in which the conviction was affirmed on the apparent proposition that a defense psychiatrist's opinion of insanity was countered (sufficiently to raise a jury question) by the testimony of Dr. Haines as to the defendant's sanity based upon his examination of the defendant made at a time substantially after the date of the crime.

Another case which we cite by way of example is *People v. Skeoch*, 408 Ill. 276, 280, in which a conviction was reversed for failure of the State to meet its burden of proof after a defense psychiatrist had testified to the defendant's insanity on the basis of a hypothetical question. In the instant case, the defense interposed was founded upon both a hypothetical question and a psychiatric examination after the event.

■■ The State argues also that since Dr. De Vito did not make an independent investigation to substantiate the facts related to him by defendant, his diagnosis based on those facts was untrustworthy, again citing *People v. Count, supra*, p. 262, where the court said: "He [Dr. Haines] was of the opinion that anything defendant told a psychiatrist in an examination made for the purpose of determining his legal sanity would be self-serving and unreliable. This finds support in common sense and in *People v. Hester*, 39 Ill.2d 489 * * *." This alleged flaw in the defense testimony as to insanity cannot be of assistance to the State unless we were to hold as a matter of law that all evidence based on such psychiatric examinations are, in effect, inadmissible. This we are not prepared to do, since the defense burden is to present only some evidence sufficient to raise the issue of insanity, with the burden then falling on the State to prove sanity beyond a reasonable doubt. Furthermore, the court's statement in the *Hester* opinion was concerned with testimony as to diagnosis on the basis of subjective symptoms described by a patient to a nontreating physician, citing two personal injury cases which recognized this general rule (*Jensen v. Elgin, Joliet and Eastern Ry. Co.*, 24 Ill.2d 383, 389; and *Bowman v. Illinois Central R.R. Co.*, 11 Ill.2d 186, 214.) In the instant case, Dr. De Vito based his opinion, in part, on his objective observation of defendant during the examination and coupled that with his opinion elicited through the hypothetical questioning. In *Hester*, there was no hypothetical question, as there was no proper evidentiary basis upon which it could have been propounded. Additionally, the doctor's preferred testimony in *Hester* was excluded by the trial court on objection by the State, whereas, in the instant case,

there were no objections to the testimony of Dr. De Vito as to either his examination of defendant or the hypothetical questions.

Finally, the State cites *People v. Davidson*, 82 Ill.App.2d 245, 248-49, for the proposition that an examination of defendant long after the offense is not "by itself * * * a proper basis for an opinion as to defendant's condition" at the time of the crime. There, the court found that "there was no evidence upon which the psychiatrist could have based an opinion that the stress on the date of the homicide could have 'triggered' the response because of an 'underlying mental disease or defect.'" The court found that the doctor's testimony at best showed that defendant had a psychosis which fell short of proof that he had a mental disease or defect as defined by Section 6—2 of the Criminal Code, and as found by both doctors in the instant case. The court in *Davidson* also noted that the doctor testified that he did not have sufficient facts upon which to base an opinion of the defendant's temporary insanity at the time of the offense. This being the case, the statements of the court in *Davidson* concerning the efficacy of the doctor's examination of defendant are inapplicable to the instant case.

■■ We conclude, therefore, that the affirmative defense having been properly raised, the State failed to meet its burden of proving beyond a reasonable doubt that defendant was sane at the time of the crime. Consequently, the judgment is reversed and the cause is remanded to the Circuit Court with direction to find defendant not guilty by reason of insanity, and for such further proceedings under sections 115—3(b) and 118—2 of the Code of Criminal Procedure as may not be inconsistent with this opinion. Ill. Rev. Stat. 1967, ch. 38, pars. 115—3(b) and 118—2.

Judgment reversed; cause remanded with directions.

DRUCKER and LORENZ, JJ., concur.