THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL WICKER, Defendant-Appellant.

(No. 55800;

First District—April 7, 1972.

Michael P. Toomin, of Chicago, for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Brian D. Alpert, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DRUCKER delivered the opinion of the court:

Defendant was found guilty in a bench trial of attempted murder and battery. He was found not guilty on charges of attempted robbery and aggravated battery. He was sentenced to six months for battery to run concurrently with a sentence of six to twelve years for attempted murder.

Defendant does not appeal the battery conviction but contends the following in his appeal of the conviction for attempted murder: (1) the evidence was not sufficient to warrant a finding that the acts of the defendant constituted a substantial step toward murder; (2) the State failed to prove beyond a reasonable doubt the intent element of the crime of murder; and (3) the State did not meet its burden of proving that defendant had the capacity to form an intent at the time of the offense.

*Testimony of Officer Wayne Resek,* called by the State:

At approximately noon on December 22, 1969, at 800 West Chicago Avenue, while driving in his squad car, he was hailed by a woman. He had a conversation with her and then headed west on Chicago Avenue. About 200 feet from the woman, on a bridge 100 feet above the Chicago River,

I observed the defendant, Michael Wicker—he had the man [Karijianis], with one hand around the stomach—the other hand between

his legs, and the man was lifting off the ground, about six inches.— The man was holding—hanging onto the guardrail.

The guardrail was three and one-half feet high. It was a very light, clear day and there was snow on the ground. He had a clear, unobstructed view of the defendant. Having observed the above, he and his partner got out of their squad car, placed the defendant under arrest and took him to a police station where complaints were signed.

On cross-examination he stated that Karijianis and the defendant were approximately halfway between the center and west end of the bridge on the north side. The defendant was standing up and Karijianis had both hands on the railing. The defendant had his left arm around Karijianis' waist and his right arm between Karijianis' legs.

*Testimony of George Karijianis*, called by the State:

He is 75 years old. About noon on December 22, 1969, he was on his way to Illinois Research Hospital to have his eyes and glasses tested when a young fellow (later identified as the defendant) approached him and asked him for carfare. He said he didn't have any and the defendant started hitting him and broke his glasses. He hit the defendant with his stick and then he hit the defendant in the jaw with his head. He then gave the following testimony: [1]

"After I hit him with head  *  *  *  he grabbed me again, to take me —the bridge—you know,  *  *  *.

Not have any money  *  *  *  you know, this guy  *  *  *  He trys me—to pull me—the bridge—down. Before the bridge—to take me down—I have the iron bars over there—I grab my hands, like that. It is after a few—I don't know—memory. The police—I see him after.

When asked how high off the ground he was lifted, he replied, "No, sir. No, sir, your honor." The following questioning then took place:

Karijianis. "He grabbed me, to throw me down there.

Q. Did you grab onto the guardrail?

A. Yes.

Q. With both hands?

A. Sure  *  *  *  both hands.

Q. All right. Do you remember, sir, being lifted off the ground, sir, or not?

A. No, I remember at this time, the police come in  *  *  *  and grab him."

He was about 30 feet from the guardrailing when he was first hit and the defendant "grabbed" him and "took" him by the guardrail.

---

[1] Defendant in his brief recognizes that Karijianis had some difficulty in expressing himself.

His eyesight went "on the bum" just after the defendant hit him. He had to leave the witness chair and walked to the defendant in order to identify him because his eyesight was so poor at trial.

On cross-examination the following examination took place:

Q. "Did he * * * at all, lift you up * * * Did you ever get lifted above the ground?

Karijianis. No. I get up * * * you know * * * It is after this he drive me * * * to near the * * *

Q. To the rail? But, did he ever pick your feet off the ground?

A. I don't remember * * * I don't know * * * after I grabbed the rail."

When the defendant first hit him, he was 35 feet from the bridge railing. The defendant did not take his wallet. He was on the north side of the bridge and was walking to the south side when the defendant asked him for carfare and then hit him. When the defendant approached him, he was on the sidewalk along side the bridge.

On redirect examination he stated that he weighs 165 pounds and is five feet five inches tall.

*Testimony of Patrolman James McMillan,* called by the State:

He was in the squad car with Officer Resek and described the scene of the crime as follows:

"When we come up to the scene, I saw the defendant in a * * * like a crouched position, lifting the defendant * * * up over his * * * I mean, the victim up off his feet. And, the defendant was in a position * * * over the guardrail of the bridge."

This occurred approximately 30 feet east of Halsted on the north side of the bridge, near the middle of the bridge.

McMillan demonstrated for the court the position of Karijianis as he was holding on to the guardrail but the record only indicates that there was a demonstration and that the feet of the Assistant State's Attorney (who presumably played the part of Karijianis) were about a foot off the ground.

On cross-examination he stated he supplied the attempted robbery and battery complaints for Karijianis to sign.

*Testimony of Michael Wicker,* defendant:

He is 22 years old, married and has no children. On the 22nd of December, 1969, he left home about six in the morning to go to a day labor place in order to make money for Christmas. He arrived at the day labor place at about 7:30 and left at 10:30 without getting work. He then went to the corner of Jackson and Halsted and purchased heroin at 10:45.

He then boarded the Halsted Street bus to go home. He lived at 4621 North Kenmore Avenue. He dozed off and then, thinking he missed his

stop, left the bus. "[I]t turned out I got off too soon. It was around Chicago Avenue and Halsted." (This was about six miles from his intended destination.) He looked in his pocket to see if he had any more money for the bus—he had none. He started walking home.

"Then I saw this man across the street—that I was going to borrow carfare off of him. I walked up to the man, and asked him if I could borrow carfare. And, he refused, and I hit him. We had a struggle—the two of us, and somehow in the struggle, I got hit in the head. I heard him say, it was a cane at the time—I don't know, and we were struggling. And somehow, I got behind him, and trying to pull the man down to stop him from hitting me."

When he first approached the man he was on the sidewalk. He was not trying to throw the man off the bridge, "I was just trying to pull him down on the ground." He admits he threw the first blow.

As to why he hit the man, "Well—no sir. I was high—the way he refused me—I—I really have no explanation." He did not intend to rob or throw the man over the bridge.

He had spent $16, the entire amount of money he had, on heroin which he shot into his arm. He first struck Karijianis in the face. He remembers trying to pull Karijianis to the ground, but he never lifted Karijianis off the ground. He remembers the officers arresting him.

He is about five feet eight inches tall and weighs about 140 pounds.
*Opinion*

Defendant's first contention on appeal is that there was not sufficient evidence to warrant the finding that the defendant took a substantial step toward the commission of the offense of murder as required by Ill. Rev. Stat. 1969, ch. 38, par. 8—4:

"*Attempt.]* (a) Elements of the Offense.

A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense."

The defendant in his brief concedes that the act of throwing a person from the bridge would constitute a substantial step. The issue of fact, therefore, is whether defendant was trying to throw Karijianis into the river or whether he was attempting to throw him to the ground to protect himself.

■■ Defendant urges that Karijianis' denials of being lifted off the ground create a reasonable doubt of defendant's guilt. Although Karijianis did make these denials, he also indicated that after grabbing the quardrail he did not remember what happened. Nevertheless, the clear testimony of the two police officers, evidently believed by the court, was sufficient to establish beyond a reasonable doubt that defendant

had taken a substantial step toward the commission of an act which, if completed, would have resulted in the taking of a life.

■■ Defendant contends, however, that the State failed to prove the specific intent to commit murder.[2] He contends that intent cannot be supplied "by the mere jingle of words that a man is presumed to intend the natural and probable consequences of his act," and that there must be calculation on the part of the defendant. These arguments were specifically rejected by our Supreme Court in *People v. Coolidge*, 26 Ill.2d 533, 536, 187 N.E.2d 694, 696:

"The gist or essence of the crime of assault with intent to murder is a specific intent to take life and such intent must be proved as charged beyond a reasonable doubt. However, since intent is a state of mind, and, if not admitted, can be shown only by surrounding circumstances, it has come to be recognized that an intent to take life may be inferred from the character of the assault, the use of a deadly weapon and other circumstances. (*People v. Shields*, 6 Ill.2d 200; *People v. Bashic*, 306 Ill. 341.) It is not requisite or necessary that the party charged should have brooded over the intent, or entertained it for any considerable time, but it is enough if at the instant of the assault he intended to kill the party assaulted, or it will be enough if he is actuated in making the assault by wanton and reckless disregard of human life that denotes malice, and the assault is made under such circumstances that, if death had ensued, the killing would have been murder. (*People v. Carter*, 410 Ill. 462; *Crowell v. People*, 190 Ill. 508.) As was pointed out in both *People v. Shields*, 6 Ill.2d 200, and *Weaver v. People*, 132 Ill. 536, since every sane man is presumed to intend all the natural and probable consequences flowing from his own deliberate act, it follows that if one wilfully does an act the direct and natural tendency of which is to destroy another's life, the natural and irresistible conclusion, in the absence of qualifying facts, is that the destruction of such other person's life was intended."

See also *People v. Wilson*, 3 Ill.App.3d 481, 278 N.E.2d 473.

■■ Defendant also argues that the absence of a deadly weapon ne-

---

[2] Ill. Rev. Stat. 1969, ch. 38, par. 8—4, dealing with attempt, requires that the attempt be "with intent to commit a specific offense." Murder is defined in paragraph 9—1:

"*Murder.]* (a) A person who kills an individual without lawful justification commits murder if, in performing the acts which cause the death:
   (1) He either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another; or
   (2) He knows that such acts create a strong probability of death or great bodily harm to that individual or another; * * *."

gates any inference of intent. A deadly weapon is unnecessary; the statute only requires acts that create a strong probability of death or great bodily harm. In the case at bar the defendant concedes that throwing Karijianis over the bridge would have been a sufficient act. The surrounding circumstances clearly show an intent to commit murder.

■■ Defendant's final contention is that since he asserted the affirmative defense of being under the influence of narcotic drugs, the State had the burden of proof (Ill. Rev. Stat. 1969, ch. 38, par. 3—2) and that the State failed to show beyond a reasonable doubt that defendant had the capacity to form an intent to commit the crime.

Defendant's affirmative defense is based upon Ill. Rev. Stat. 1969, ch. 38, par. 6—3:

> "*Intoxicated or Drugged Condition.*] A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:
>
> (a) Negatives the existence of a mental state which is an element of the offense; * * *."

The Illinois Supreme Court in interpreting paragraph 6—3 stated:

> "Voluntary intoxication will not provide a defense to conduct which the law regards as criminal unless the intoxication makes impossible the existence of a mental state which is an element of the crime."

(*People v. Walcher*, 42 Ill.2d 159, 163, 246 N.E.2d 256.) The statute heretofore cited applies the same standard to a "drugged condition."

Defendant alludes to several details he could not remember such as how many times he struck Karijianis. The only other evidence of a drugged condition is the defendant's statement that he took a fix. The defendant by his own testimony was aware of the following: he left the bus too soon; he checked to see if he had more money, he knew the relative positions of himself and Karijianis prior to the attack, he attempted to borrow carfare, he hit the man (Karijianis) first, and he specifically remembers trying to pull Karijianis to the ground and not trying to throw him off the bridge. If he could form the intent to pull the man to the ground, he could just as lucidly form the intent to throw him over the bridge.

The evidence showed beyond a reasonable doubt that defendant had the capacity to form an intent to commit murder.

The judgment is affirmed.

Judgment affirmed.

LORENZ, P. J., and ENGLISH, J., concur.