THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JESSE HUNTER, a/k/a GERALD HUNTER, Defendant-Appellant.

(Nos. 56256, 57501 cons.;

First District (1st Division)—October 1, 1973.

James J. Doherty, Public Defender, of Chicago, (Bernard L. Schwartz, Assistant Public Defender, of counsel,) for appellant.

Bernard Carey, State's Attorney, of Chicago, (Kenneth L. Gillis and John M. Cutrone, Assistant State's Attorneys, and Nicholas P. Iavarone, Senior Law Student, of counsel,) for the People.

Mr. JUSTICE EGAN delivered the opinion of the court:

Three indictments covering a series of events that occurred on August 23, 1969, were consolidated, and the defendant, Jesse Hunter, was convicted in a bench trial of the burglary of the home of Louis Suchy, the aggravated battery of Louis Suchy and Sirflonia Barber and the rape of Millie Cathy Savage. He was sentenced to one to two years for the aggravated battery of Sirflonia Barber; two to five years for the aggravated battery of Louis Suchy; two to five years for the burglary; and four to six years for the rape. All sentences were to run concurrently.

On August 23, 1969, Sirflonia Barber was living at 2025 West Roosevelt Road in Chicago with her children, including her daughter, Millie Cathy Savage. Between 2:00 and 2:30 A.M. Millie, at the request of her mother, answered a knock at the door and saw the defendant, whom she knew by the name of Gerald. When Sirflonia asked the defendant what he wanted, he told her that he had some Scotch that he wanted to sell and asked if she wanted to buy some. She told him she did not drink and the defendant left, saying he would be back. Sirflonia Barber had known the defendant for about three years. He had been in her apartment before and was a friend of her daughter, Helen Ann Savage. Millie Savage, who was 14 years old at the time, was dressed in her nightgown when she first answered the door. She changed to shorts, bra and sweater.

When the defendant returned, he had a shopping bag with him and told her mother that he had some Scotch. When her mother asked if she could look in the bag, the defendant said: "No, I better look in it because there might be a shotgun in it." He then took a knife out of the bag and put it to Sirflonia Barber's neck. The defendant told the children to get into the bedroom, but they would not. The defendant told

them that if they did not get into the room he would kill their mother. Sirflonia asked the defendant what he wanted, but he did not answer. She then told Millie to go in her purse and get $10. When Millie returned with the money, the defendant hit her in the eye, and she dropped the money. Millie then ran downstairs to get help and saw L. C. Evans and his son, and Eddie Lewis. She told them her mother was in trouble, and they ran upstairs. In the meantime the defendant was scuffling with Sirflonia. He stabbed at her as she crouched under a table and again after she ran into her bedroom. She was holding the right sleeve of his coat; he held the blade of the knife in his gloved right hand while she held the handle. He struck her once on the side of the head with his fist and bit her twice on the arm in an attempt to make her release the knife. After she finally wrested the knife away from him, she threw it to her oldest son, who ran downstairs and gave it to L. C. Evans. During the struggle with the defendant her blouse was torn off. She was bleeding from a scratch on her neck. It was stipulated that she was later treated at Illinois Research Hospital for human bite marks to the forearm and hand. After Evans broke the front door open, the defendant ran out. She saw Millie about 30 minutes later as Millie was running down Roosevelt Road naked and shouting, "Mommy, Mommy." Millie was crying and said, "He did it, he did it." Sirflonia testified that the defendant was in her apartment for more than 20 minutes and appeared to be "high," but she did not smell alcohol.

Millie, after Evans ran up the stairs to help her mother, was screaming and was restrained by a neighbor woman. When Millie saw the defendant come down the stairs, she jerked loose and ran across Roosevelt Road; and the defendant started chasing her. He caught her and put a gloved hand across her mouth. There was a large group of people standing in front of her house; and there were no obstructions to their view of her and the defendant; but they did not do anything when the defendant caught her. He then started pulling her toward Hoyne to a basement in back of a house. A man named Gene told the defendant he should let her go because she did not have anything to do with him and her mother. The defendant told him to mind his own business.

She was taken to a stairway leading to the basement. The defendant then tore off her sweater and bra and pulled her shorts off. After he had taken her clothes off, he removed all of his clothes. He told her to lie down on the stairs and then had intercourse with her for about 10 minutes. She testified that at this time the defendant looked "high" and his eyes were "real droopy." While they were having intercourse, the defendant heard someone in the alley and told her that if she made any

noise he would kill her. The witness testified that she did not consent to having intercourse with the defendant; she did not scream because the defendant had his hand over her mouth; she did not struggle, punch or scratch; and at no time in her life before this occurrence had she had sexual intercourse.

After the man in the alley had left, the defendant ran down the alley pulling her. Neither she nor the defendant had any clothes on at this time. Eddie Lewis was coming down the other end of the alley and told the defendant to stop, but he did not. Lewis ran and caught up with them. He started fighting and struggling with the defendant, and Millie broke loose and ran home. The first one she saw was her mother, who covered her with a blanket, and the police were called. They took her back to the place where the defendant had intercourse with her which was 2107 West Roosevelt Road. The police found her clothes, a comb, a silver medal, and a cream colored glove on the stairway leading to the basement. The bra strap and sweater were torn, and there was a hole in her shorts.

Doctor Michael Rubin examined Millie Savage that night at Illinois Research Hospital; no sperm was found, the hymenal ring was torn and there was evidence of anterior vaginal wall trauma. Fresh blood on the hymenal ring and on the anterior vaginal wall indicated that the trauma was recent. He did not find any marks or bruises on any other part of her body. She told him that the assailant tore her clothes off, threatened to kill her and had intercourse with her.

At about 2:45 A.M. the defendant entered the home of Louis Suchy, who was 75 years old, at 2009 West Washburn by breaking through a side window on the first floor and a plasterboard partition used as a display window. When Suchy, who had been awakened by the noise, opened the door to the front parlor, he saw the defendant standing with pants on but no shirt, crouched in a "judo stance." When Suchy asked him what he wanted, he threw Suchy to the floor and began beating him, knocking him unconscious. When Suchy came to, he saw the defendant dragging his 72 year old wife down the hall. His grandson, who knew the defendant, came in and yelled, "Gerald, what are you doing to my Grandma?" The defendant ran into a side room and Suchy's grandson locked that door. In the meantime, his daughter, Lorraine Bobczyk, had been awakened by the noise, and, after seeing the defendant assaulting her father and mother, ran out and called the police, who arrived shortly thereafter and arrested the defendant.

The defendant's brother, Anthony Hunter, testified that the defendant had swallowed "about five" capsules of "Treinols" (or "Trianol") that

Helen Savage gave him at 11:45 P.M. They went to the poolroom on the first floor of the building where Sirflonia Barber lived at 12:30 A.M. The defendant had no difficulty walking. During this time he noticed that the defendant was acting unusual and his eyes were bulging. He had previously seen people "under the influence" of these particular pills and the defendant was "under the influence" of the pills. He had seen his brother under the influence of pills once before. He asked the defendant why he didn't go home, and he answered that he wasn't going home. His eyes were "glittering."

L. C. Evans testified that he separated the defendant from Sirflonia Barber and told him to leave the apartment. Evans had known the defendant since he was a young child and testified that he had never seen him act the way he was that night; he was sweating and blowing; his eyes were "reddish looking" and "wildish looking."

Officer Armata testified that he saw the defendant at the Suchy home, that he was perspiring very heavily, and he did not notice anything unusual about his appearance.

Louis Suchy testified that when he saw the defendant choking his wife the defendant said: "You don't want her to get hurt, do you? Quiet."

Officer Albert Giannoni testified that when he and his partner arrested the defendant in the Suchy home, he did not resist; he was sweating and seemed exhausted.

Officer William Boyd testified in rebuttal that he saw the defendant about 4:30 A.M. The defendant, who was wearing pants, shoes and socks, but no shirt, seemed to have been perspiring. Boyd told him of the accusations made against him and warned him of his rights. The defendant said he understood; that he was fighting with Sirflonia Barber over money she owed him; that he took Millie down the alley and she took her clothes off; that he was "fixing to have some, but some people came by"; that he broke a glass to enter a home on Washburn and "the old white guy" (Suchy) wouldn't let him get out.

The defendant did not testify.

The defendant's principal contention is that the State failed to prove beyond a reasonable doubt that he was capable of forming the requisite mental state for all of the offenses committed.

■■ Section 6—3 of the Criminal Code (Ill. Rev. Stat. 1971, ch. 38, par. 6—3) provides:

> "A person who is in an intoxicated or drugged condition is criminally responsible for conduct unless such condition either:
>
> (a) Negatives the existence of a mental state which is an element of the offense; or

: (b) Is involuntarily produced and deprives him of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law."

This section makes no change in the substantive law as to intoxication, but provides that the same law shall apply to a drugged condition. (See *People v. Wicker*, 4 Ill.App.3d 990, 282 N.E.2d 771.) The substantive law as to intoxication provides that voluntary intoxication is ordinarily not a defense to the commission of a crime, but, if it is so extreme as to suspend entirely the power of reason and render the accused incapable of any mental action, he cannot be convicted of any crime which involves specific intent or malice. (*People v. Winters*, 29 Ill.2d 74, 81, 193 N.E.2d 809.) Thus, this defense is not available to the defendant on the charge of rape, which is a general-intent crime. (*People v. Gold*, 38 Ill.2d 510, 516, 232 N.E.2d 702; *Askew v. State*, 118 S.2d 219; *State v. Hairston*, 222 N.C. 455, 23 S.E.2d 885; *Steele v. State*, 189 Tenn. 424, 225 S.W.2d 260.) The question, therefore, is whether the defendant was drugged to the extreme that his power to reason was entirely suspended and he was rendered incapable of forming the intent required of burglary or aggravated battery. Whether he was is a question of fact to be decided, in this case, by the trial judge. *People v. Freedman*, 4 Ill.2d 414, 420, 123 N.E.2d 317.

The only testimony identifying the type of pills swallowed by the defendant was given by Anthony Hunter. The Report of Proceedings at one point referred to the pills as "Treinol." The following day, when Hunter was recalled, the Report of Proceedings referred to "Trianol." We assume that this was due to a change of reporters. Hunter described the pills as red and blue.

· We have examined the Physician's Desk Reference to Pharmaceutical Specialties and Biologicals (27th ed. 1973). It does not contain any drug called "Treinol" or "Trianol," but it does contain, at page 16, a product of the Eli Lilly pharmaceutical company called "Tuinal." It comes in red and blue capsules of 50, 100, and 200 milligrams. It is described at page 907 as a combination of equal parts of sodium secobarbital and sodium amobarbital which results in a moderately long-acting, rapidly effective hypnotic drug. Adverse reactions include idiosyncrasy, in the form of excitement, hangover, or pain. Symptoms of overdosage include respiratory depression, depression of superficial and deep reflexes and constriction of the pupils to a slight degree (though in severe poisoning they may dilate).

No evidence of the chemical composition of the pills was introduced. The reason given by the defense attorney for not doing so was that, since the defendant need only introduce "some evidence" of his drugged

condition, the burden shifted to the State, and the defendant need not prove anything further.

Regardless of the make-up of the particular pill involved, however, no reasonable mind could conclude from this evidence that the defendant had not introduced some evidence that he was in a drugged condition within the meaning of the statute. But we believe that the defense has misconstrued the applicable law at both the trial and in this court. They argued, and continue to do so, that once evidence is introduced that the defendant was "under the influence of drugs" then the burden is placed on the State to prove beyond a reasonable doubt that he was not "under the influence of drugs." It would appear that the defendant has confused the defense of intoxication with the defense of insanity.

The cases cited by the defendant are not applicable. The *People v. Taylor*, 1 Ill.App.3d 1053, 275 N.E.2d 717, was an insanity case, where the court repeated the general rule that where some evidence of insanity is introduced, the State is obliged to offer evidence to the contrary. In *People v. Gilday*, 351 Ill. 11, 183 N.E. 573 and *People v. Jones*, 263 Ill. 564, 105 N.E. 744, the supreme court reversed because of improper instructions on intoxication. *People v. Evrard*, 55 Ill.App.2d 270, 204 N.E. 2d 777, provides support for the position of the State rather than the defendant. The court held that the evidence supported the finding of the trial court that the defendant's intoxication was not so great that he was incapable of forming specific intent and that a reviewing court will not substitute its judgment for the trial court.

■■ There is no rule requiring the State, where the defendant introduces "some evidence" of intoxication or a drugged condition, to introduce evidence that the defendant was not intoxicated or drugged to any extent. The trial court in his summation recognized that the defendant was drugged to some extent but, citing the applicable law in *People v. Evrard* and *People v. Winters*, held as follows:

> "As I understand the law in Illinois, a drugged person is criminally responsible for his conduct unless his drugged condition renders him incapable of acting knowingly and, I will add, intentionally.
>
> The court, based on all the evidence, the nature of the evidence, the testimony of all the witnesses, does hereby find there is no evidence in this record which renders the defendant, on August 23, 1969, incapable of acting knowingly and intentionally."

■■ We believe that a trier of fact could properly conclude that the State had proved the defendant's responsibility beyond a reasonable doubt. While no one could fail to recognize that the defendant's behavior was bizarre, to say the least, other facts, for example, his remark

to a bystander to mind his own business, his warnings to Millie and Suchy to remain quiet, the subterfuge used when he went to Sirflonia's apartment, his attempted flight when he was confronted by his former classmate, Suchy's grandson, and importantly, his attempt to exculpate himself in a statement to Boyd, indicate, it may be fairly argued, a person whose power to reason had not been entirely suspended.

■■ The defendant next contends that the evidence fails to show that the act of intercourse took place forcibly and against the will of Millie Savage. This record shows a 14 year old girl, awakened in the early morning, who had no previous sexual experience, saw her mother attacked in her own home with a knife by a man on a rampage, was struck by that man, fled screaming for help and ran from that man, was ignored by bystanders and threatened if she cried out she would be killed, had her clothes torn from her, had intercourse on a basement landing, ran down the street naked and made an immediate complaint, was examined by a physician who found recent trauma in her vaginal area. We are asked to say that that evidence shows that she yielded without that degree of resistance required by law. We not only will not say it, but, rather, we agree completely with the trial court's finding.

The defendant's next contention is that the evidence fails to establish that Sirflonia Barber suffered great bodily harm or permanent disability or disfigurement within the meaning of the aggravated battery statute (Ill. Rev. Stat. 1971, ch. 38, sec. 12—4). In *People v. Smith*, 6 Ill.App.3d 259, 264, 285 N.E.2d 460, the court upheld a conviction for aggravated battery where the defendant "struck the complainant twice in the face with his fist, gave her a lump in her mouth, put a scar on her face, and left bruises under the chin." In *People v. Polansky*, 6 Ill.App.3d 773, 775, 287 N.E.2d 747, the court upheld a conviction for aggravated battery where the complainant was "attacked in the middle of the night, knocked to the floor, then kicked and stomped, which resulted in injuries which required a period of hospitalization." The blows caused a swelling of the forehead and pain in his lower chest and upper abdominal area.

■■ It has been repeatedly held that what constitutes great bodily harm is a question of fact. (*People v. Meeks*, 11 Ill.App.3d 973, 297 N.E. 2d 705; *People v. Machroli*, 100 Ill.App.2d 227, 241 N.E.2d 609; *People v. Cavanaugh*, 18 Ill.App.2d 279, 152 N.E.2d 266.) In this case, Sirflonia Barber was hit once on the side of the head by the defendant's fist; she was bitten twice on her arm and had scars left from the bite marks; she bled from the scratch on her neck caused, it may be inferred, by the defendant's knife; she was given an inoculation for the bite marks. From these facts it cannot be said as a matter of law that the proof is so unsatisfactory that a reversal is required.

The defendant was found guilty of two separate counts of aggravated battery against Louis Suchy. One count alleged that Suchy received great bodily harm. The defendant does not contest the sufficiency of the State's evidence as to this finding. The other count alleged that the defendant had used a deadly weapon, and it is contended that the proof fails to show that the defendant had used a deadly weapon.

■■■■ The existence of a deadly weapon may be inferred from circumstantial evidence. (*People v. Rice,* 109 Ill.App.2d 391, 248 N.E.2d 745.) In this case, Louis Suchy testified that he was knocked out, that his ear was cut and required taping, and that his head was full of glass-like "shrapnel." His daughter testified that she saw the defendant sitting on top of her father, striking him with something. The next day she swept up broken glass, in the area where she saw her father struck. She described the glass as coming from a broken beer bottle or pop bottle. She kept some bottles in the hallway area where her father was struck. It was stipulated that Suchy's injuries included a concussion and cuts to the biceps area and bruises to the eardrum. From this evidence the fact-finder could reasonably infer that the defendant struck Suchy with a bottle which, it is conceded, may be a deadly weapon. (*People v. Fort,* 119 Ill.App.2d 350, 256 N.E.2d 63.) We believe the circumstantial evidence is sufficient to establish beyond a reasonable doubt that the defendant used a bottle in his assault of Louis Suchy.

In the burglary count the defendant was charged with breaking and entering the home of Louis Suchy with intent to commit theft. He now contends that the evidence was insufficient to establish an intent to commit theft, and we agree.

■■■■ The cases cited by the State stand for the propositions that intent must ordinarily be proved "circumstantially by inferences drawn from conduct appraised in its factual environment" (*People v. McCoy,* 3 Ill.App.3d 642, 646, 279 N.E.2d 417); and that in the "absence of inconsistent circumstances, proof of unlawful breaking and entry into a building which contains personal property that could be the subject of larceny gives rise to an inference that will sustain a conviction of burglary." (*People v. Johnson,* 28 Ill.2d 441, 443, 192 N.E.2d 864.) We believe the evidence of this case does disclose circumstances inconsistent with an intent to steal. The *Johnson* case, on which the State heavily relies, involved a tavern, the owner of which was awakened at 3:00 A.M. by his dog. He looked out from his home and saw two men in the vicinity of the tavern. The men broke a glass in the door through which one of the men entered the tavern. When the police arrived the defendant jumped out of the doorway swinging a lug wrench at one of the officers. There are some important differences between the facts in *Johnson* and

this case. In *Johnson* it was obvious that the tavern was vacant at the time of entry; there was no evidence of any previous unusual behavior on the part of the defendant; and, most important, although the breaking of the glass could be heard, the entry was intended to be surreptitious. We cannot ignore the previous violent actions of the defendant in this case; and neither his tumultuous entry into the premises accomplished by breaking apart a wooden partition in an occupied home nor his. unprovoked assaults on Suchy and, particularly, his wife could hardly be considered evidence of intent to steal which ordinarily is manifested by furtive behavior. The case cited by the defendant, *People v. Soznowski*, 22 Ill.2d 540, 177 N.E.2d 146, is persuasive. There, the defendant, who had been drinking, broke into a home at 3:00 A.M., entered the bedroom of the owner's wife and began beating her. The Supreme Court reversed the conviction for burglary with intent to commit theft, noting that the beating of a sleeping woman tended to disprove the existence of an intent to commit larceny.

 Since there has not been a final adjudication, the Unified Code of Corrections is applicable to the sentences of the defendant. (*People v. Caritinos*, 9 Ill.App.3d 782, 292 N.E.2d 899.) After the briefs had been filed, the defendant filed a motion for the summary reduction of the sentences for burglary and the aggravated battery of Louis Suchy to a minimum sentence of one year and eight months and a maximum of five years. That motion is allowed and the sentence for the aggravated battery is modified to a minimum of one year and eight months and a maximum of five years. The judgment of conviction of rape is affirmed. The judgment of conviction of the aggravated battery of Louis Suchy is affirmed as modified; the judgment of conviction of the battery of Sirflonia Barber is affirmed; the judgment of conviction of burglary is reversed.

Judgments reversed in part and affirmed in part as modified.

BURKE, P. J., and HALLETT, J., concur.